IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AKIRA T. BROWN,

                Petitioner,

        v.                                          CASE NO. 09-3048-JAR

RAY ROBERTS, WARDEN, EL DORADO
CORRECTIONAL FACILITY

and

STEVE SIX, KANSAS ATTORNEY
GENERAL,

                Respondents.

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner Akira Brown's Petition for a Writ of Habeas Corpus (Doc. 1) seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254 from his state conviction. Having reviewed the record which includes Respondents' Answer and Return (Doc. 8), the Court denies the petition.

**1.**     **Background**

Brown was convicted in Sedgwick County District Court of first-degree premeditated murder for the shooting death of James Cooper. The Kansas Supreme Court affirmed Brown's conviction and "hard 40" sentence, noting the "prosecution's theory that the shooting was motivated by animosity between rival street gangs,...[t]hat several eyewitnesses identified Brown as the shooter and, after several hours of interrogation, he confessed."[1] In the present action, Brown claims his confession during that police interrogation was not free and voluntary, and contends the trial court's denial of Brown's motion to suppress this evidence violated Brown's constitutional right against self incrimination.

Relevant to this single claim, the Kansas Supreme Court set forth the following facts:

---

[1]*State v. Brown*, 285 Kan. 261, 265 (2007).

The rivalry that formed the basis of the State's theory of the case was between the Bloods and Junior Boys gangs. The Junior Boys gang, which consists of "older" gang members, has two subsets formed of younger members: the Second Street Junior Boys and the Hill Block Junior Boys. Officer Espinoza, a gang intelligence officer, testified that tension between the Bloods and Junior Boys had resulted in several violent incidents separate from the current crime. Espinoza mentioned gang intimidation, various forms of "disrespect," shootings, and murder. History had shown that verbal confrontations between a Blood and a Junior Boy could easily escalate into physical violence when gang members "back-up" fellow members.

The victim of the shooting in this case, James Cooper, was a member of the Bloods. Shortly after midnight on January 11, 2003, Cooper and his girlfriend, Cecilia Arnold, joined several Bloods gang members at "The Cave" nightclub in Wichita. Members of the Hill Block and Second Street Junior Boys gangs, including Brown who is a member of the Hill Block gang, were also present at "The Cave."

When the nightclub closed around 2 a.m., a crowd estimated to number "a couple hundred" exited onto the streets and sidewalks around the club. Several fights broke out in the crowd.

According to Arnold, she and Cooper prepared to leave in Arnold's car when Terrell Cole-a member of the Second Street gang (one of the Junior Boy subsets and a rival gang to Cooper's gang)-ran in front of the car, chasing two persons while holding a gun. The couple got out of the car because Cooper wanted to tell the others to "quit tripping" or calm down. Arnold testified that Cooper basically followed Cole and told him to stop fighting and put away the gun, saying, "We all kicked it. We all had fun. Let's call it a night." Arnold indicated that, although she did not see the gun anymore, Cole kept a "cocky" and "bodacious" attitude toward Cooper. Cooper told Cole he would remember how Cole was acting. Arnold was not certain where Cole went after the conversation with Cooper, but she thought he "kind of mingled off into the crowd."

Cooper's cousin Bruce Berry had walked up at some point during the confrontation, and he also spoke to Cooper. Then, Arnold and Cooper, holding hands, started to walk away but stopped when they saw a commotion in the crowd. A single shot rang out, and the bullet struck Cooper in the back of his head causing a fatal

wound. ...

[After eyewitnesses identified Brown as the shooter, officers arrested Brown at an apartment complex around 3:17 a.m.]

Brown was placed in custody and taken to the police station, where he was given the *Miranda* warnings. He was handcuffed to a table and held in an interrogation room for approximately 12 hours during which he was interrogated periodically by two detectives for a total of approximately 5 hours. During breaks in the interrogation, Brown napped, was given restroom breaks, and was allowed to eat.

Brown's version of events changed numerous times over the course of his interview. At first, he said that he stood outside the club talking to a woman he called "Dee," noticed a few fights, and then heard some "gunshots." Brown told the detectives he was standing next to a car on the north side of Second Street at the time of the shooting. He indicated that Dee left with him in the car immediately thereafter.

When Detectives James Hosty and Timothy Relph told Brown that eyewitnesses placed him in a different location-in the middle of a fight-he initially said that Dee and two men were with him at the scene and would verify his story. Brown's interview was put on hold for approximately 3 hours and 15 minutes while these three witnesses were located and interviewed at the station. Then, Detectives Hosty and Relph returned to their interview with Brown.

The officers informed Brown that they had spoken to the three individuals, but none had verified anything he had previously told them. At first, Brown continued to say he was with the three others, but then his story changed. Eventually, he told the officers that he saw a large black male, a possible gang member, outside of the club fighting and that the fight moved out into the street. Although Brown said he did not know the man's name, he identified Cole, through a photo, as the person involved in the altercation. Brown admitted that the two men he had earlier identified were not with him during the shooting, but stated that he was walking down Second Street when the shots were fired.

In another version of events, Brown said "Big 2," later identified as Cole, handed an unknown black male a handgun and the unknown male shot Cooper in the

3

middle of the street. Then, Brown changed his story to state that the unknown male was actually Adrian Patterson, also known as "A1." He told the officers that he stood close to Patterson along with Cole next to the fight and that Patterson was the person who shot Cooper.

At another point in the police interview, Brown said that while Cole was arguing with Cooper, Cole handed Patterson a gun and when Patterson raised the gun, Brown put his hand on the gun in an attempt to stop the shooting just as the gun fired. Finally, when the officers told Brown that witnesses saw only one person holding a gun, not three, he began to cry and admitted that he was the one who fired the gun.[2]

Brown filed a pre-trial motion to suppress his confession. After conducting a hearing and reviewing the interrogation videos, the trial court observed that Brown was advised of his *Miranda* rights, and that Brown waived those rights and agreed to speak with the officers. The court noted Brown was 21 years old at the time of the interview, appeared to be a person of reasonable intelligence, and had previous exposure to the criminal justice system. The court found the officers' interrogation techniques were not overly aggressive, and the officers had not promised Brown anything or threatened him in any way. As to the duration and conditions of the interrogation, the court noted that because the officers stopped to investigate aspects of the case based on information Brown provided, the actual duration of police questioning was under five hours during the twelve hours Brown was held in the interrogation room. During breaks in questioning, the court noted that Brown appeared to be napping and resting, and was given breaks to use the bathroom and eat a meal. On these factual determinations, the trial court concluded Brown's will was not overcome and denied Brown's motion to suppress.

Brown challenged this decision in his direct appeal. The Kansas Supreme Court upheld the trial court's decision, finding Brown's confession was voluntary and admissible.[3]

## II. Standard of Review

---

[2]*Id*. at 267-71.

[3]*Id*. at 278.

4

Because the Kansas Supreme Court adjudicated this claim on its merits, Brown is entitled to federal habeas relief only if he can establish the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[4] or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]

A state court's decision is "contrary to" an established federal law if the state court reaches a different result than the Supreme Court would when presented with facts that are "materially indistinguishable from a relevant Supreme Court precedent" or if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases."[6] A decision is an "unreasonable application" of clearly established federal law if a "state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."[7] The Supreme Court has repeatedly instructed that an unreasonable application of federal law is something more than simply an application the habeas court might not itself have reached in the first instance or one the habeas court thinks is incorrect.[8] Abject deference to a state court's adjudication is not required, but a federal court is prohibited from substituting its own judgment for that of the state court.[9]

Additionally, a federal court's review of a habeas petition must presume the state court's factual determinations are correct unless the petitioner rebuts that presumption by a showing of clear and convincing evidence.[10]

### III.  Analysis

---

[4] 28 U.S.C. § 2254(d)(1).

[5] 28 U.S.C. § 2254(d)(2).

[6] *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

[7] *Id*. at 412-13.

[8] *See e.g.*, *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002).

[9] *Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir. 2007)(citations and quotation marks omitted).

[10] 28 U.S.C. § 2254(e)(1).

The Fifth Amendment protection against self-incrimination, applicable to the states through the Due Process Clause of the Fourteenth Amendment,[11] commands that a coerced confession is inadmissible at a defendant's trial.[12] "[T]o reduce the risk of a coerced confession and to implement the Self-Incrimination Clause, [the Supreme Court in *Miranda*] concluded that the accused must be adequately and effectively apprised of his rights[.]"[13] "The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing, to relieve the 'inherently compelling pressures' generated by the custodial setting itself, 'which work to undermine the individual's will to resist,' and as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary."[14]

To establish that a confession is involuntary, a showing of coercive police activity is required.[15] The totality of the circumstances is to be examined on the entire record, including "(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment."[16]

While compliance with *Miranda* does not conclusively establish the voluntariness of a subsequent confession, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."*[17]* [G]iving the warnings and getting a waiver has

---

[11]*Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

[12]*Missouri v. Seibert*, 542 U.S. 600, 607-08 (2004).

[13]*Id*. at 608 (internal quotation marks and citations omitted).

[14]*Berkemer v. McCarty*, 468 U.S. 420, 433 (1984)(internal citations, quotation marks, and footnotes omitted).

[15]*Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

[16]*United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 2009)(citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

[17]*Berkemer*, 468 U.S. 4 at 33, n.20.

6

generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."[18]

In the present case, it is undisputed that *Miranda* warnings were given to Brown, and that Brown voluntarily waived those rights and agreed to talk to the officers. The trial court conducted a hearing and heard testimony from officers involved in Brown's arrest and interrogation, and then considered relevant factors in deciding that Brown's confession under the totality of the circumstances was voluntary and uncoerced. Brown contends this decision was unreasonable "given the true nature of the facts of the case,"[19] and characterizes the circumstances of his custodial interrogation as being subjected to the impact of unnecessary physical restraint over a lengthy period of time during which he was exhausted, in pain, unable to sleep, unable to communicate with the outside world, and repeatedly questioned. Brown also claims his confession resulted from nine hours of badgering by the detectives until he told them he shot the victim.

The Kansas courts rejected this version of Brown's custodial interrogation. Recognizing the voluntariness of Brown's confession had to be determined under the totality of the circumstances with the State bearing the burden of proving by a preponderance of the evidence that the confession was admissible,[20] the Kansas Supreme Court specifically addressed the following factors.

(1) *Brown's mental state* - The state supreme court found Brown did not specially argue his mental state impaired the voluntary nature of his confession, found Brown's responses were appropriate in respect to the questions asked, and found nothing to indicate Brown was under the influence of drugs or alcohol.[21]

---

[18]*Seibert*, 542 U.S. at 608-09.

[19]Petitioner's supporting memorandum, Doc. 4, p. 12.

[20]*State v. Brown*, 285 Kan. at 271-72.

[21]*Id.* at 272.

(2) *The duration and manner of the interview* - The court found Brown's confinement in the interrogation room for an extended period of time caused the issue of voluntariness to be close" and "stretch[ed] the temporal boundaries [established in Kansas cases] of an uncoercive interrogation," but distinguishing the hours of interrogation from hours of such confinement, and considering the breaks and naps provided, found the duration and manner of the interview was not coercive.[22]

(3) *Whether Brown was denied access to the outside world* - The court found the circumstances regarding Brown's contact with the outside world did not coerce his confession.[23] Specifically, the court found no merit to Brown's claim that an officer's comment implied a warning that Brown could not bring a lawyer into his negotiations with the officers, and noted an officer had contacted Brown's foster mother as Brown requested.[24] The court further noted it was understandable under the circumstances to deny Brown's request to make a phone call while officers were checking alibi witnesses Brown had identified.[25]

(4) *Brown's age, intellect, and background* - The court noted Brown was 21 years old with previous experience in the judicial system, and the record supported the trial court's finding that Brown appeared to be a person of reasonable intelligence.[26]

(5) *Fairness of the officers* - The court found that officers urging Brown to tell the truth did not render Brown's confession involuntary, found their comments about Brown's family were an admonition to be truthful and not an attempt to extort by fear, and found their questions to Brown about why he shot the victim in relation to the degrees of punishment Brown might be facing did not constitute any direct or implicit bargain or promise.[27] In sum, the court found "the

---

[22]*Id*. at 272-74.

[23]*Id*. at 275.

[24]*Id*. at 274.

[25]*Id*. at 275.

[26]*Id*.

[27]*Id*. at 275-78.

officers' conduct was not of a nature to overcome Brown's free will and render his statements involuntary and inadmissible." [28]

(6) *Brown's fluency in English* - The court noted that Brown did not raise any claim regarding his ability to understand and communicate in English.[29]

On this comprehensive review, the Kansas Supreme Court concluded that "while the duration and manner of the interview are troubling, on that basis alone we do not conclude that Brown's free will was overborne. An examination of the totality of the factors and circumstances of the interrogation lead to the conclusion the statements were the product of Brown's free and independent will."[30]

Having reviewed Brown's habeas petition in light of the state court record, this Court finds no clear and convincing evidence that any factual determination by the state court was in error, and finds the state court's conclusion that Brown's confession was voluntary and admissible was not contrary to, or an unreasonable application of, federal law as decided by the Supreme Court. Although Brown further argues the use of handcuffs was unnecessary, and maintains the coercive effect of this show of physical authority over an extended period of time for no cause should color all other factors and require special consideration, these specific allegations encompass conditions addressed in *Miranda* as inherent to custodial interrogation, for which protective warnings were to be delivered to protect an individual's right against self incrimination.[31] In Brown's interrogation, there is no question that the protective *Miranda* warnings were properly administered, and that Brown waived his right to remain silent.

---

[28]*Id*. at 278. The petition before this Court centers on the second and third factors considered by the Kansas Supreme Court, and does not rely on specific allegations of unfair tactics which were the focus of Brown's challenge to that court. See *id*. at 275.

[29]*Id*.

[30]*Id*.

[31]*Miranda*, 384 U.S. at 448-58; see also *id*. at 467 ("We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.").

Uncoerced statements are admissible in evidence.[32] The Court finds the Kansas Supreme Court properly addressed factors recognized as relevant to whether Brown's confession was voluntary under the totality of the circumstances, consistent with United States Supreme Court precedent, and concludes Brown has not established the state proceeding "resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[33] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding." [34]

IT IS THEREFORE ORDERED BY THE COURT that the Petition for a Writ of Habeas Corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254 is DENIED.

**IT IS SO ORDERED.**

Dated: December 16, 2009

                S/ Julie A. Robinson
                JULIE A. ROBINSON
                UNITED STATES DISTRICT JUDGE

---

[32]*Id*. at 478.

[33]28 U.S.C. § 2254(d)(1).

[34]28 U.S.C. § 2254(d)(2).